# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

UNITED STATES OF AMERICA

v.

HUSSEIN SALEH SALEH

FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

NOV [] 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

MAGISTRATE'S CASE NO.

**07 - 1873M**

Complaint for violation of Title 18, United States Code, Section 2320 (Trafficking in Counterfeit Goods) and Title 18, United States Code, Sections 1956 and 1957 (Money Laundering)

| NAME OF MAGISTRATE JUDGE<br><br>HONORABLE VICTOR B. KENTON | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATES OF OFFENSES<br>March 14, 2007;<br>August 22, 2006 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) | |
|---|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

<u>Count One</u>:  On or about March 14, 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendant HUSSEIN SALEH SALEH intentionally trafficked in goods, namely, counterfeit shirts, and knowingly used a counterfeit mark, namely, the brand name "Lacoste," on and in connection with such goods, which mark was identical with and substantially indistinguishable from a genuine mark in use and duly registered for those goods on the principal register in the United States Patent and Trademark Office, and the use of which mark was likely to cause confusion, to cause mistake, and to deceive.

<u>Count Two</u>: Money laundering in violation of Title 18, United States Code, Sections 1956 and 1957.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
    (See attached affidavit which is incorporated as part of this Complaint)

| MATERIAL WITNESSES IN RELATION TO THIS CHARGE: | *[signature]* |
|---|---|
| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>KRISTEN T. ELLIOTT |
| | OFFICIAL TITLE<br>SPECIAL AGENT-FBI |

| Sworn to before me and subscribed in my presence, | | |
|---|---|---|
| SIGNATURE OF MAGISTRATE JUDGE(1) *[signature]* | | DATE<br><br>November 1, 2007 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.

BLH:blh       REC: DETENTION (warrant)

<u>AFFIDAVIT</u>

I, Kristen T. Elliott, being duly sworn, hereby depose and say:

## I.  INTRODUCTION

1.  I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and have been so employed for over five years.  I am presently assigned to the FBI, Los Angeles Division, Counterterrorism Squad 4 ("CT-4").  CT-4 is comprised of agents from the FBI, the Drug Enforcement Administration ("DEA"), the Internal Revenue Service ("IRS"), Immigration and Customs Enforcement ("ICE") and state and local law enforcement personnel assigned as Task Force Officers ("TFOs").  During this time, I have received training in terrorism-related investigations.  I have had experience in investigations involving individuals who are involved in narcotics trafficking, counterfeit clothing, mail fraud, structuring cash deposits and bulk cash smuggling.

2.  This affidavit is made in support of a criminal complaint against and arrest warrant for HUSSEIN SALEH SALEH ("SALEH") for violation of 18 U.S.C. § 2320 (trafficking in counterfeit goods) and 18 U.S.C. §§ 1956, 1957 (money laundering).  This affidavit also is made in support of search warrants for two subject premises associated with SALEH, specifically:  (1) FASHION LATINA clothing store located at 226 East Pico Boulevard, Los Angeles, California; and (2) the

-1-

residence located at 6710 Flora Avenue, Bell, California. The premises are fully described in Attachment A for each warrant. I believe the subject premises contain evidence, instrumentalities, and fruits of violations of 18 U.S.C. § 2320 and 18 U.S.C. §§ 1956, 1957; the items to be seized at each location are fully described in Attachment B to each warrant.

3.     In preparing this affidavit, I have conferred with other federal agents who are experienced in the area of counterfeit clothing including ICE Special Agent Loan McIntosh-Rupp and members of the Los Angeles Police Department and Los Angeles County Sheriff's Department ("LASD"), who investigated the sale of counterfeit clothing and related crimes.

4.     I make this affidavit based upon information and evidence provided by witness statements, discussions, and reports submitted by other investigative law enforcement officers and agents, as well as physical evidence, and my own personal knowledge and experience. Because this affidavit is being submitted in support of a search warrant, I have not included each and every fact known to me concerning this investigation.

5.     I base my knowledge of the contents of the intercepted calls on the wiretaps described below on transcripts or summaries prepared by agents or other monitors who listened to the calls; occasionally I have listened to the actual recording of a call. For calls not in English, I have relied on translations.

-2-

6.    The identities of the suspects were ascertained through a variety of methods.  Some of these methods included names used by the speakers themselves during intercepted conversations, and surveillance activity, including enforcement activity by local law enforcement agencies, where the drivers of particular vehicles were identified.  The speakers also were identified by subscriber information, surveillance, voice identification by agents and monitors who have compared voices, or by the speakers' own identification of themselves.

## II.  PROBABLE CAUSE THAT CRIMES HAVE OCCURRED

7.    Based on my participation in this investigation, I know the following:

a.    The government is investigating the use of clothing stores in the Los Angeles area to facilitate and disguise illegal activities, including sale of counterfeit clothing, and other crimes.

b.    SALEH was the owner of a clothing store called STAR CITY A & H, which was located at 1262 South Los Angeles Street, Los Angeles, California.  He recently moved his store to 226 East Pico Boulevard, Los Angeles, California, and renamed it FASHION LATINA.  As explained below, SALEH and other persons have used the store to further various criminal activities.

c.    Between February 2007 and March 2007, the government obtained a court-authorized wiretap on the cell phone

-3-

used by SALEH.   Intercepted calls on this phone revealed that
SALEH purchases, stores, and sells counterfeit clothing.

A.   THE SALE OF COUNTERFEIT CLOTHING

Prior Counterfeiting Activity

8.   Based on information from a variety of sources, I
believe that SALEH and others have used STAR CITY A & H as a site
for the sale of counterfeit clothing.   These include:

a.   The arrest of SALEH on March 27, 2002, for
manufacturing/selling over 1,000 pieces of counterfeit registered
trademark clothing.   On April 27, 2004, SALEH was convicted of
manufacturing/selling over 1,000 pieces of counterfeit registered
trademark clothing, a felony.   He was sentenced to 36 months
probation and one day in jail.

b.   The arrest of SALEH on March 15, 2006, for
manufacturing/selling over 1,000 pieces of clothing with
counterfeit registered trademarks.   Although arrested, charges
were not filed against him.

c.   On February 9, 2007, the undercover purchase at
STAR CITY A & H of five pairs of counterfeit jeans bearing the
name brands 7FAM, Citizen of Humanity, Bebe, and Baby Phat.

d.   The arrest of SALEH on March 14, 2007, for
manufacturing/selling more than 1,000 pieces of clothing with
counterfeit registered trademarks.

f.   Intercepted phone call on March 16, 2007, during

-4-

which Lucia Martinez ("Lucia") alerted SALEH that someone was taking pictures of her in the store. SALEH instructed Lucia to take everything out and put it away, so when law enforcement arrives at the store, they won't find anything.

### Telephone Conversations Regarding the Sale of Counterfeit Clothing

9.     The majority of intercepted calls between SALEH and others were in Arabic and Spanish. I have reviewed these calls, which have been translated into English, and have based my knowledge that the following occurred regarding counterfeit clothing on these translations:

a.     On February 28, 2007, an unknown female ("UF"), later identified as Lucia, called SALEH and told SALEH that he screwed her with the True Religion, the men's. Lucia stated it (True Religion) was made in China and that she didn't notice. SALEH asked her how many boxes she had and if she got one box. Lucia confirmed and stated that nobody wanted them because they're made in China and that she didn't know. SALEH told Lucia to bring it (the box) back to him and that he didn't know. SALEH also told Lucia that he would sell it for her.

b.     Based on my training, experience, and the investigation to date, I believe that SALEH sold Lucia counterfeit men's True Religion clothing. I also believe that none of Lucia's customers wanted this clothing after they discovered it was counterfeit and made in China.

-5-

c.    On March 6, 2007, SALEH placed a call to SUSANNE
Elreda ("SUSANNE") and asked if SUSANNE had an answer for him.
SUSANNE told SALEH that the price was based on quantity and her
nephew's claim that their best prices will be on container load
orders.   SALEH told SUSANNE that he can order 100 to 200 boxes
depending on models and prices.   SUSANNE told SALEH that she
thought he had stopped working with these items at his store.
SALEH told SUSANNE that yes, he will work with them, it is the
only way he can make a living.   SALEH said the Baby Phat
merchandise is "bull shit business," not profitable at all, and
they sell them at a dollar or two profit, especially the few
stores that opened up lately.   SUSANNE asked SALEH which stores,
but he did not want to name them.   SUSANNE asked SALEH if he
meant that he is no longer working with original brand name
merchandise.   SALEH replied of course yes, but you know....
SUSANNE told SALEH that she does not want to talk over the phone.

d.    Based on my training, experience, and the
investigation to date, I believe that SUSANNE and SALEH are
discussing the purchase and sale of counterfeit clothing.   I also
believe that SUSANNE is referring to counterfeit clothing when
she told SALEH that she thought he had stopped working with
"these items" at his store.   I further believe that SALEH
believes that the only way he can make money is by selling
counterfeit clothing.

-6-

e.   On March 7, 2007, SALEH received a call from Hassan Saleh Saleh ("Hassan") and was told by Hassan to get rid of all the counterfeited Baby Phat brand at the shop window. SALEH asked why.  Hassan stated that they are searching for the Baby Phat.  SALEH stated that he knew that and that somebody told him and Hassan Henna.  Hassan told SALEH that somebody gave him a call an hour earlier regarding the Baby Phat.  Hassan then stated that he did not have Baby Phat and warned SALEH to be careful. SALEH said that Hassan was right.

f.   Based on my training, experience, and the investigation to date, I believe that Hassan is warning SALEH that law enforcement is in the area and that they are looking for counterfeit Baby Phat clothing.  I also believe that Hassan does not want SALEH to get caught by law enforcement, so he told SALEH to remove the Baby Phat from SALEH's store window.

g.   On March 8, 2007, SALEH received a call from Hassan in which Hassan was complaining about a box of Lacoste shirts that he received.  Hassan stated that they sewed a sticker to cover the Lacoste signs on the shirts to be able to pass it through the customs.  SALEH stated that he knows about that label thing.  Hassan stated that he told the guy who got the shirts that it was his (the guy's) job to change that box.

h.   Based on my training, experience, and the investigation to date, I believe that Hassan is complaining to

-7-

SALEH about a box of Lacoste shirts that he received, which still had stickers sewn over the Lacoste logos. I also believe that these stickers were placed over the Lacoste logos in order to get the counterfeit shirts through United States Customs without getting caught. I further believe that once the counterfeit shirts made it through United States Customs, the stickers would be removed from the Lacoste logos and then they would appear as authentic Lacoste shirts and could be sold as such. I believe that SALEH is aware of this practice of sewing stickers or the like, over brand name logos to pass the counterfeit clothing through United States Customs.

      i.  On March 8, 2007, SALEH placed a call to an unknown male ("UM") and was told by the UM that they would fix the sign and make it ready. SALEH told the UM that he (SALEH) needed them because a customer was waiting. The UM assured SALEH that the merchandise will be ready today.

      j.  Based on my training, experience, and the investigation to date, I believe that SALEH is trying to get the Lacoste shirt problem corrected. I also believe that the UM told SALEH that the people in possession of the Lacoste shirts will fix the "sign," meaning the stickers sewn over the Lacoste logos, and make the shirts ready to sell.

The March 14, 2007 Seizure

    10.  Based on intercepted calls and review of reports by

other law enforcement officers, I know the following about a seizure of counterfeit clothing that occurred on March 14, 2007.

a.   On March 14, 2007, LASD deputies executed a state search warrant for STAR CITY A & H.  The LASD deputies more than 3,500 counterfeit items worth approximately $233,000, which included over $1,100 worth of counterfeit Bebe jeans and over $180,000 worth of counterfeit Lacoste polo shirts.  SALEH has not yet been charged with this conduct.

b.   On March 15, 2007, SALEH received a call from SUSANNE regarding SALEH's arrest and the search of his store. SUSANNE advised SALEH not to sell counterfeits anymore.  SALEH said that if he deals with counterfeits it won't be in his store. SUSANNE told SALEH to keep any counterfeited merchandise out of his store because there will always be raids.

B.   MONEY LAUNDERING

11.   Based on telephone calls intercepted on the wiretap for and my knowledge of money laundering activity at clothing stores similar to SALEH's stores, I believe that SALEH has engaged in money laundering; in particular, the laundering of cash through the purchase and distribution of money orders with ALI ELREDA ("ALI").  I also know that persons who engage in illegal activity that generates large amounts of cash, such as trafficking in counterfeit clothes, often also are money launderers.

12.   On August 22, 2006, at approximately 5:00 p.m., FBI

-9-

SAs Scott Foster and James F. Bas conducted surveillance at STAR CITY A & H. During that time, intercepted calls on ALI's cell phone indicated that ALI and another person were going to meet SALEH at STAR CITY A & H in order to launder money by bringing SALEH $40,000 in money orders in exchange for cash.

      a.    During the surveillance, SA Foster observed ALI and an unknown male enter STAR CITY A & H at approximately 5:15 p.m. Neither one was carrying anything in their hands. At approximately 5:35 p.m., the unknown male left STAR CITY and walked to and got inside an S-Class Mercedes with paper plates that was parked up the street. He was carrying a black bag that appeared to be partially full. ALI then walked to and got inside the same S-Class Mercedes at approximately 5:40 p.m., and then drove away.

      b.    The Special Agents believed that the black bag contained the cash from SALEH and possibly some clothes, based on the way the bag looked.

    13.    On September 7, 2006, approximately $100,000 in money orders were seized from ALI at Los Angeles International Airport ("LAX"). ALI was booked on an Air France flight to Paris, France, en route to Lebanon. Intercepted calls between Hassan Saleh Saleh (SALEH's brother) and ALI alerted the government that ALI would attempt to smuggle the money orders out of the country.

-10-

14.   Of the 109 money orders that were seized from ALI,
eleven of them were purchased on August 22, 2006.  These money
orders therefore were purchased on the same day as the
surveillance at STAR CITY (see above).

     a.   These eleven money orders are detailed below:

| Serial Number | Amount | Time Issued | Location Purchased |
|---|---|---|---|
| 08-464706533<br>08-464706532 | $1,000<br>$1,000 | 4:11 PM<br>4:11 PM | Su Casa De Cambio<br>9335 E. Slauson Ave.<br>Pico Rivera, CA |
| 08-524071441<br>08-551461184 | $1,000<br>$1,000 | 4:18 PM<br>4:18 PM | LA Check Cashing<br>7822 Rosemead Blvd.<br>Pico Rivera, CA |
| 08-513246751<br>08-513246752 | $1,000<br>$1,000 | 5:57 PM<br>5:57 PM | Maywood Quick Check<br>3436 E. Slauson Ave.<br>Maywood, CA |
| 4855170408<br>4855170409<br>4855170410 | $1,000<br>$1,000<br>$  950 | 6:00 PM<br>6:00 PM<br>6:00 PM | Nix C.C. # 12<br>15925 Atlantic Blvd.<br>Maywood, CA |
| 08-514630105<br>08-514640106 | $1,000<br>$1,000 | 6:12 PM<br>6:12 PM | Bell Quik Check<br>4137 E. Gage<br>Bell, CA |

     b.   More generally, all of the seized money orders
are consistent with the operation of a money laundering scheme in
that they have no purchaser information listed on them, they are
for amounts around $1,000, and the "pay to the order of" line was
left blank.

15.   On November 28, 2006, at approximately 6:38 p.m.,
ALI's cell phone placed an outgoing call to SALEH's cell phone.
During the telephone call, the following conversation took place:

     a.   SALEH asked ALI if ALI had been in contact with

-11-

his (ALI's) friend, the Mexican guy.  ALI asked if it was the guy
who provided the "manakeesh" (plural for Arabic-style pizza,
which I believe to be a coded reference to money orders).  SALEH
said yes.  ALI said that whatever SALEH needed, ALI would be able
to provide it no problem.  SALEH said that he (SALEH) wanted to
make a bigger order than that (undisclosed).  ALI said that a
bigger order is probably difficult, however he (ALI) has not been
to the bakery too much as SALEH knows.  SALEH said that he knows
that ALI's "pizzas" are not very good, but his (ALI's) friend
makes really good "pizzas."  ALI said that he would find out.

      b.  Based on my training, experience and the
investigation to date, I believe that SALEH is asking ALI if ALI
has been in contact with the person who obtains the money orders.

    16.  On December 14, 2006, at approximately 1:59 p.m.,
SALEH called ALI.  During the telephone call, the following
conversation took place:

      a.  SALEH asked ALI if ALI's friend had called ALI up.
ALI said it would be no problem if SALEH wanted to do something
because ALI would send the worker ALI has "to do papers" for
SALEH.  SALEH said no problem and then asked if he
(unintelligible) could make "about 50 pizzas."

      b.  Based on my training, experience and the
investigation to date, I believe that SALEH is asking ALI if ALI
has been in contact with the person who obtains the money orders.

I also believe that ALI said that it would not be a problem if SALEH wanted to convert cash into money orders because ALI would send that person to SALEH.  I believe that SALEH wants to convert approximately $50,000 in cash into $50,000 worth of money orders.

**III   PROBABLE CAUSE FOR ITEMS TO BE SEIZED**

A.   GENERAL ITEMS

17.  Based on my training and experience, as well as my conversations with senior agents and officers, I know the following about subjects involved in the trafficking of counterfeit goods (hereinafter "counterfeit traffickers"):

a.   Counterfeit traffickers maintain counterfeit samples, books, records, customer lists, receipts, notes, ledgers, other papers relating to the transportation, ordering, sales and the distribution of counterfeit wearing apparel.  The aforementioned counterfeit samples, books, records, receipts, notes, ledgers, are commonly maintained where the counterfeiters have ready access to them; e.g., homes, offices, automobiles, warehouse facilities, and storage facilities.

b.   Maintaining off-site storage facilities allows individuals trafficking in counterfeit goods to hide the majority of their products should the nature of their counterfeit wearing apparel business become known to law enforcement.

c.   Counterfeit traffickers commonly maintain in their residences addresses or telephone numbers in books or

-13-

papers that reflect names, addresses, and/or telephone numbers for their associates in counterfeit trafficking organizations.

      d.   Counterfeit traffickers often store information regarding trafficking in counterfeit goods on computer databases. This information may be as simple as customer lists and may be as elaborate as documenting current sales of counterfeit wearing apparel.

    18.   On October 29, 2007, LASD deputies, in an undercover operation, looked through the merchandise on sale at FASHION LATINA clothing store. They did not find any obviously counterfeit clothing, which suggests that SALEH is no longer selling counterfeit clothing directly from the store.

    19.   Nonetheless, I believe that there is probable cause to believe that documents and other evidence relating to the sale of counterfeit clothing and money laundering will be found at both of the SUBJECT PREMISES. Along with the other information set forth in this affidavit, this belief is based on the following:

      a.   To the offender, the evidence may seem innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys

-14-

to safe deposit boxes, packaging materials, computer hardware and software). To law enforcement, however, such items may have significance and relevance when considered in light of other evidence.

        b.     The criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.

        c.     The criminal offender may also be under the mistaken belief that he/she has deleted, hidden or further destroyed computer-related evidence, which in fact, may be retrievable by a trained forensic computer expert (as discussed below).

        d.     It appears that SALEH engaged in the sale of counterfeit clothing over a period of several years. It therefore is particularly unlikely that he disposed of all records of this activity at both his residence and his business.

B.    COMPUTER DATA

    11.  Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is

-15-

not always possible to search computer equipment and storage
devices for data for a number of reasons, including the
following:

a.    Searching computer systems is a highly technical
process which requires specific expertise and specialized
equipment.  There are so many types of computer hardware and
software in use today that it is impossible to bring to the
search site all of the necessary technical manuals and
specialized equipment necessary to conduct a thorough search.  In
addition, it may also be necessary to consult with computer
personnel who have specific expertise in the type of computer,
software application or operating system that is being searched.

b.    Searching computer systems requires the use of
precise, scientific procedures which are designed to maintain the
integrity of the evidence and to recover "hidden," erased,
compressed, encrypted or password-protected data.  Computer
hardware and storage devices may contain "booby traps" that
destroy or alter data if certain procedures are not scrupulously
followed.  Since computer data is particularly vulnerable to
inadvertent or intentional modification or destruction, a
controlled environment, such as a law enforcement laboratory, is
essential to conducting a complete and accurate analysis of the
equipment and storage devices from which the data will be
extracted.

-16-

c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers.  Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would completely fill a 35' x 35' x 10' room to the ceiling.  Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs.

d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   In addition, computer users can

-17-

conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

C.  ARABIC-LANGUAGE MATERIAL

20.  Based on my knowledge of the investigation, I believe some of the items to be seized will be in the Arabic language. SALEH, ALI, and Hassan Saleh Saleh are Arabic speakers.  Numerous intercepted calls concerning the sale of counterfeit clothing and the use of money orders in apparent money laundering schemes have been in the Arabic language.

21.  I expect that numerous subject premises in this investigation which will be searched on the same day may contain material in the Arabic language.  I do not believe that the government will be able to have a fluent Arabic speaker present at each of the subject premises being searched.  If an Arabic speaker is not present at the subject premises, or if the volume of Arabic-language material is too large to permit timely review by the Arabic speaker who is present, Arabic-language material which might reasonably be among the items to be seized will be taken from the subject premises and reviewed within thirty (30)

-18-

days.

D.   PRIVILEGE ISSUES

22.   Based on my review of the sources stated above, I
believe that SALEH may have consulted with an attorney regarding
his numerous arrests.  It therefore is possible that materials
protected by the attorney-client privilege may be present at the
subject premises.  The procedure for seizing documents possibly
protected by the attorney-client privilege is set forth in
Attachment C to the warrant.

**IV.  CONCLUSION**

12.   Based on my training, experience, and consultation
with other Special Agents and law enforcement officers, and the
above facts enumerated in this affidavit, I believe that probable
cause exists to believe that HUSSEIN SALEH SALEH has violated 18
U.S.C. § 2320 and 18 U.S.C. §§ 1956, 1957.  I also believe that
evidence, instrumentalities, and fruits of violations of these
statutes, as described in Attachment B to each warrant, will be

//
//
//
//
//
//
//

-19-

found at each SUBJECT PREMISES, as described in Attachment A to
each warrant.

KRISTEN T. ELLIOTT
Special Agent
Federal Bureau of Investigation

SUBSCRIBED TO AND SWORN BEFORE ME
THIS ___ DAY OF NOVEMBER, 2007

UNITED STATES MAGISTRATE JUDGE

-20-