1  RONALD O. KAYE (No. 145051)
   KAYE, McLANE & BEDNARSKI, LLP
2  128 North Fair Oaks Avenue
   Pasadena, California 91103
3  Telephone: (626) 844-7660
   Facsimile: (626) 844-7670
4  rok_kmb@earthlink.net

5  Attorneys for Defendant
   Hussein Saleh Saleh
6

7                    UNITED STATES DISTRICT COURT

8                   CENTRAL DISTRICT OF CALIFORNIA

9                         WESTERN DIVISION

10

11  UNITED STATES OF AMERICA,          )   NO. CR 07-1267-ODW
                                       )
12             Plaintiff,              )   **DEFENDANT'S POSITION RE:**
                                       )   **SENTENCING**
13       v.                            )
                                       )   **[FILED CONCURRENTLY**
14  HUSSEIN SALEH SALEH                )   **WITH SUPPORTING EXHIBITS**]
                                       )
15             Defendant.              )   Date: April 1, 2009
                                       )   Time: 2:00 p.m.
16                                     )   Court: Hon. Otis D. Wright, II
                                       )
17  _____)

18
        The defendant, Hussein Saleh Saleh, by and through his attorney of record,
19
    Ronald O. Kaye, hereby submits the following position paper with respect to
20
    sentencing factors.
21
                                  Respectfully submitted,
22
                                  KAYE, McLANE & BEDNARSKI, LLP
23

24

25  DATED: March 12, 2009       By_____/S/_____
                                     RONALD O. KAYE
26                                   Attorney for Defendant
                                     Hussein Saleh Saleh
27

28

**I.**

**INTRODUCTION**

Hussein Saleh Saleh is set to be sentenced before this Court on April 1, 2009, at 200 p.m.  In the presentence report (PSR), the probation office has calculated an adjusted guideline range of 30 to 37 months.  The guideline range is based upon an adjusted offense level of 20, pursuant to guideline section 2B5.3 and its application of section 2B1.1, a downward adjustment of 3 levels for acceptance of responsibility, and placement in Criminal History Category III.  The probation office has recommended a sentence at the low-end of the guideline range, or 30 months.

The defense objects to a guideline range of 24 to 30 months as calculated by the probation office.  As demonstrated below and highlighted in the exhibits and letters filed separately with the Court, Mr. Saleh's case falls outside the heartland of counterfeit product cases.

Based on the evidence presented in the presentence report, the defense accepts the loss amount of $230,453.  Consequently, Mr. Saleh will receive an aggravated felony under Immigration & Nationality Act 8 U.S.C. § 101(a)(43)(M) in that the offense: "(I) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000."  Thus, as a result of this conviction, Mr. Saleh will be deported from this country.

As demonstrated in Exhibit A, Mr. Saleh's political asylum application filed on June 7, 2005, before his escape to the United States, Mr. Saleh has repeatedly been a victim of persecution in Lebanon, and has a compelling political asylum case.  As a result of this conviction and the resulting aggravated felony, this asylum case will be abandoned and he will be deported.  But in addition, deportation from this country means deportation for his entire family.  As discussed in the letter of Hassna Hussein Ubeid, Mr. Saleh's wife, provided to the Court at Exhibit B, his wife is unable to provide for the family, and therefore, the family will follow Mr. Saleh.  Thus, this family, with three children facing severe health problems (as described in Exhibits H,

1

I and J) – a two year old son that has birth defects which include possible

hydrocephalus (fluid on the brain), gastro-intestinal and spinal problems; a 9 year old

daughter who continues to suffer headaches, pain and trauma when shrapnel entered

her head from a bomb which exploded in her vicinity in Lebanon in 2006; and a 12

year old daughter with a chronic injury to her spine – are returning to a war-torn

country where Mr. Saleh is a target for persecution and where health care will

inevitably be substandard.  Banishment from the United States where Mr. Saleh and

his family have resided, and where his children have received the necessary medical

care, is something Mr. Saleh must accept.  Based on this inevitable impact of the

collateral consequences from this case, however, Mr. Saleh requests a substantial

departure from the guidelines in this case.

18 U.S.C. § 3553(a) requires a court to "impose a sentence sufficient, but not

greater than necessary, to comply with the purposes set forth in paragraph 2."[1]

Ultimately, based on the arguments presented herein and the supporting

documentation, the defense requests that the Court sentence Mr. Saleh to time served,

with the condition that he be immediately placed in the custody of the Bureau of

Immigration and Customs Enforcement.  Clearly, he will face custodial time in

immigration custody prior to deportation, and then he will be sent to a country which

he fled from based on a well founded fear of persecution.

This dramatic impact on Mr. Saleh and his family as a result of this conviction

is sufficient punishment for this man.  As demonstrated throughout the letters filed

with the Court at Exhibit B, Mr. Saleh is a well respected family man, known

throughout his community for being a positive influence on society.  The defense

---

[1] These purposes, as set out in § 3553(a)(2), are:
(a)  retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");
(b)  deterrence;
(c)  incapacitation ("to protect the public from further crimes"); and
(d)  rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").

1 | requests that the Court use the discretion granted by Congress under 18 U.S.C.

2 | §3553(a) and find compassion for Mr. Saleh.  The letters and supporting

3 | documentation provided to the Court do not lie – the hardship this man will face in

4 | the future warrants leniency at sentencing.

5 |

6 | **II.**

7 | **ARGUMENT**

8 | The Federal Sentencing Guidelines were held to be advisory in *United States v.*

9 | *Booker,* 543 U.S. 220 (2005). The Supreme Court held *in Rita v. United States,* 127

10 | S.Ct. 2456 (2007), that sentencing judges are required to impose a sentence

11 | sufficient, but not greater than necessary, to comply with the basic aims of sentencing

12 | in § 3553(a). This is known as 3553(a)'s parsimony provision, and it serves "as the

13 | guidepost for sentencing decisions post-*Booker.*" *United States v. Ferguson,* 456

14 | F.3d 660, 667 (6th Cir. 2006). In *Rita,* the Supreme Court forbade district courts from

15 | according a presumption of reasonableness to the Guidelines. *Rita,* 127 S.Ct. at 2465

16 | ("The sentencing court does not enjoy the benefit of a legal presumption that the

17 | Guidelines sentence should apply."). The Supreme Court in *Rita* emphasized that a

18 | district court may sentence below the guideline range if it determines that "the

19 | Guidelines sentence should not apply, perhaps because (as the Guidelines themselves

20 | foresee) the case at hand falls outside the 'heartland' to which the Commission

21 | intends individual Guidelines to apply, perhaps because the Guideline sentence,

22 | itself, fails properly to reflect 3553(a) considerations, or perhaps because the case

23 | warrants a different sentence regardless." *Rita,* 127 S.Ct. at 2465 (citations omitted).

24 | After *Booker,* a district court should place "no limitation" on the information

25 | concerning the background, character, and conduct of a person convicted of an

26 | offense. 18 U.S.C. § 3661; *Booker,* 125 S.Ct at 760 (quoting § 3661). As Justice

27 | Stevens recognized in his concurrence in *Rita,* "many individual characteristics ... are

28 | not ordinarily considered under the Guidelines," but are nevertheless "matters that §

1

1   3553(a) authorizes the sentencing judge to consider." *Rita,* 127 S.Ct at 2473

2   (Stevens, J., concurring). Therefore, even if the Guidelines prohibit or limit

3   consideration of a particular fact as the basis for a downward departure, a

4   post-*Booker* sentence reduction based on the same "prohibited" fact is authorized by

5   § 3661, as long as such a reduction furthers one or more of the purposes of

6   sentencing under § 3553(a). These principles are echoed in the Supreme Court's

7   decisions in *Kimbrough v. United States,* 128 S.Ct. 558 (2007) and *Gall v. United*

8   *States,* 128 S.Ct. 586 (2007).

9        The primary sentencing mandate of Section 3553(a) states that courts must

10  impose the minimally sufficient sentence to achieve the statutory purposes of

11  punishment – justice, deterrence, incapacitation, and rehabilitation: "the court shall

12  impose a sentence sufficient, but not greater than necessary to comply with the

13  purposes set forth in [18 U.S.C. § 3553(a)(2)]." 18 U.S.C. § 3553(a).

14       This "parsimony provision" is not simply a factor to be considered in

15  determining a sentence; it represents a cap above which the Court is statutorily

16  prohibited from sentencing – even when a greater sentence is recommended by the

17  guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir.

18  1989)(Becker, J., concurring in part, dissenting in part).

19       In this case, an analysis of the § 3553(a) factors reveals that a sentence of

20  probation, with Mr. Saleh surrendering to immigration custody to await deportation,

21  is sufficient but not greater than necessary to achieve the goals of sentencing.

22       18 U.S.C. § 3553(a)(1) requires that the Court to consider: (1) the nature and

23  the circumstances of the offense and the history and characteristics of the defendant.

24  18 U.S.C. § 3661 states that "[n]o limitation shall be placed on the information

25  concerning the background, character, and conduct of a person convicted of an

26  offense which a court of the United States may receive and consider for the purpose

27  of imposing an appropriate sentence." 18 U.S.C. § 3661, *quoted in Booker*, 125 S. Ct.

28  at 760.

2

1    Consequently:

2         Sentencing will be harder now than it was a few months ago.
         District courts cannot just add up figures and pick a number
3         within a narrow range. Rather, they must consider all of the
         applicable factors, listen carefully to defense and government
4         counsel, and sentence the person before them as an individual.
         *Booker* is not an invitation to do business as usual.
5
*United States v. Ranum*, 353 F. Supp. 2d 984, 987 (E.D. Wis. 2005).
6
         In sentencing Mr. Saleh, the defense requests this Court to review his life
7
history, and the collateral consequences of his conviction, for purposes of 18 U.S.C. §
8
3553(a)(1).
9

10
**B.    THE COLLATERAL CONSEQUENCES OF MR. SALEH'S**
11
**CONVICTION – THE LIKELIHOOD THAT HE WILL ENCOUNTER**
12
**VIOLENCE AFTER HIS DEPORTATION TO LEBANON**
13
         There is no question that Mr. Saleh will be deported to Lebanon after this case.
14
Deportation from the United States to a country where he has faced severe
15
persecution and realistically may face similar persecution in the future – in and of
16
itself – is an extreme punishment which this Court should consider for purposes of
17
sentencing. *See Lennon v. INS*, 527 F.2d 187, 193 (2d Cir.1975) ("Deportation is not,
18
of course, a penal sanction. But in severity it surpasses all but the most Draconian
19
criminal penalties. We therefore cannot deem wholly irrelevant the long unbroken
20
tradition of the criminal law that harsh sanctions should not be imposed where moral
21
culpability is lacking."); *United States v. Gonzalez-Mendoza*, 985 F.2d 1014 (9th Cir.
22
1993)("Deportation is a sanction as harsh or harsher than many sanctions provided
23
by the criminal law.").
24
         After *Booker*, extraordinary collateral consequences from a criminal conviction
25
can be considered, *See United States v. Samaras*, 390 F.Supp.2d 805,809 (E.D. Wis.
26
2005)(where defendant convicted of fraud, sentence below guideline warranted in
27
part because "as a consequence of his conviction and sentence, defendant lost a good
28
public sector job, another factor not considered by the guidelines").  Moreover, courts

3

1  have looked at the goals of sentencing, and have reasoned that several of the concerns

2  relevant to punishment are ameliorated for a defendant who is being deported.

3       In *United States v. Biheiri*, 356 F.Supp.2d 589 (E.D. Va. 2005), an Egyptian

4  defendant was convicted of financing terrorism.  In support of a sentence of 13

5  months, the court held:

6       Because Biheiri will be deported to Egypt immediately following
        his release from confinement, the goals of protecting the public
7       and providing rehabilitative opportunities are of little import in the
        instant circumstances. And, while it may appear that a longer
8       sentence is appropriate given Biheiri's involvement in terrorist
        financing, the principle that a defendant should only be punished
9       for the offenses of conviction as provided by law commands that
        this involvement should not drive the sentence.

10  *Id.* at 603.

11       Attached hereto at Exhibit A is Mr. Saleh's Political Asylum Application.  The

12  application reveal both the persecution faced by Mr. Saleh while living in Lebanon

13  and before he fled that country.  Exhibits C, D, E and F confirm the conditions

14  suffered by Mr. Saleh in Lebanon, including documents from the United States State

15  Department.

16       Paragraphs 70 through 77 of the PSR describe the persecution suffered by Mr.

17  Saleh.  This includes:

18  •    In 1990, Mr. Saleh was forcibly conscripted into the South Lebanon Army

19       (SLA), where he served for five years.  Mr. Saleh was responsible for

20       monitoring suicide attacks by Hezbollah and enemies of SLA.  Mr. Saleh quit

21       the SLA when he was required to kill opposition members, their families and

22       other civilians.  When later pressured to rejoin SLA, Mr. Saleh's refusal

23       brought on the label of "deserter."  Consequently, Mr. Saleh went into hiding.

24  •    As a result of his "deserter" status, Mr. Hussein's brothers – Hassan and Jamal

25       – were arrested by the SLA.  In addition, the SLA threatened to destroy the

26       family's home if they did not disclose his location.

27  •    In November of 1996, Mr. Saleh was arrested by the SLA and detained for

28       approximately one month in a small cell.  He was fed intermittently, placed in

4

1    isolation with no visitors, and was permitted to bathe only one time while in

2    captivity.  Mr. Saleh was interrogated, accused of being a member of

3    Hezbollah, held at gunpoint, and threatened to that both he and his parents

4    would be killed.  When he rejected the accusations, SLA members beat him

5    repeatedly with the back of a rifle.

6    •    In December of 1996, Mr. Saleh's parents were able to able to bribe SLA

7        leaders for the release of Mr. Saleh.  Mr. Saleh was then hospitalized based on

8        the substantial loss of weight and injuries suffered during interrogation.

9    •    In May of 1997, Mr. Saleh's parents traveled to Beirut, Lebanon.  While there,

10        Hezbollah militia continuously harassed and questioned them, inquiring about

11        Mr. Saleh's whereabouts.

12   •    In June of 1997, Mr. Saleh was arrested by SLA agents. At a remote location,

13        the agents insisted that Mr. Saleh rejoin the militia, which he refused.  In

14        response, the SLA members shot bullets between his feet, and also wounded

15        his left arm.  The SLA members also pushed him to the ground, and beat him

16        repeatedly with their rifles.  As a result of this beating, Mr. Saleh suffered

17        injuries on his body and face, his vision was blurred, and he suffered weight

18        loss.

19   •    In November and December of 1997, the SLA advised Mr. Saleh's father that

20        Mr. Saleh either rejoin the militia or face death.  Consequently, Mr. Saleh fled.

21        During the period Mr. Saleh was a refugee, Mr. Saleh's parents were repeatedly

22        questioned about his whereabouts.

23   •    With the SLA pressure against Mr. Saleh and his family always present, Mr.

24        Saleh was smuggled to Beirut, and prepared to leave the country.  Mr. Saleh

25        was in hiding, avoiding both SLA and Hezbollah members.  Ultimately, Mr.

26        Saleh fled to Mexico and then to the United States.

27        Attached hereto at Exhibit D, is a printout from the British Broadcasting

28   System: *Israel Accused of War Crimes* by Orest Slepokura, November 3, 2000.  The

1  article confirms the persecution faced by Mr. Saleh while in the custody of SLA:

2        Khiam prison was a detention and interrogation centre during the
3        Israeli occupation in Southern Lebanon.  To help secure its hold
      on Southern Lebanon, Israel armed a local Lebanese militia, the
4        South Lebanon Army or SLA. The SLA provided Khiam's guards
      and interrogators.

5        The article goes on to describe how detainees were tortured and held in solitary

6  confinement by the SLA, similar to Mr. Saleh's description of the events which

7  transpired in Lebanon before he sought political asylum in the United States.

8        Similarly, Exhibit E, *Jewish group accuses Israel of war crimes* by Joseph

9  Abboud, January 31, 2000, describes the conduct of the South Lebanon Army in

10  Khaim detention centre as "shameful and inhumane," with severe examples of

11  residents being arrested and tortured at the prison.

12        The retaliation against suspected SLA army members is also supported by

13  documentation.  In Exhibit F, *JTA: SLA Militiamen "dazed, disoriented,"* by Orest

14  Slepokura, May 24, 2000, the reporter describes the pervasive fear that members of

15  the SLA feel; the perception of SLA members as traitors in Lebanon; and how these

16  SLA fighters have been abandoned by Israel.  Thus, as a prior SLA fighter, Mr. Saleh

17  remains highly vulnerable to persecution by Hezbollah when he returns to Lebanon.

18        The overall human rights situation presently in Lebanon is described in the

19  *United States State Department Country Reports on Human Rights Practices - 2008*,

20  attached hereto at Exhibit C, at page 1.

21        On May 7, opposition fighters led by Hizballah, a Shia opposition
      party and terrorist organization, seized control of Beirut
22        International Airport and several West Beirut neighborhoods to
      protest government decisions to declare Hizballah's
23        telecommunication network illegal and remove the airport security
      chief because of the presence of Hizballah's surveillance cameras
24        monitoring the airport. During the heavy fighting, 84 persons were
      killed and approximately 200 were injured. On May 21 in Doha,
25        Qatar, rival leaders reached an agreement to end the violence and
      the 18-month political feud. Sectarian clashes continued to break
26        out between the Druze and Hizballah across the country and
      between Sunnis and Alawites in the northern part of the country,
27        leading to the deaths of approximately 70 persons and the
      wounding of 275. UN Security Council (UNSC) resolutions 1559
28        and 1701 call upon the government to take effective control of all
      Lebanese territory and disarm militia groups. However, despite the

6

1

2

3

presence of the Lebanese and UN security forces, Hizballah retained significant influence over parts of the country, and the government made no tangible progress towards disbanding and disarming armed militia groups, including Hizballah.

4

5

6

7

8

9

10

There were limitations on the right of citizens to change their government peacefully. Militant and sectarian groups committed unlawful killings, and security forces arbitrarily arrested and detained individuals. Torture of detainees remained a problem, as did poor prison conditions, lengthy pretrial detention, and long delays in the court system. The government violated citizens' privacy rights, and there were some restrictions on freedoms of speech and press, including intimidation of journalists. The government suffered from corruption and a lack of transparency. There were limitations on freedom of movement for unregistered refugees, and widespread, systematic discrimination against Palestinian refugees and minority groups continued. Domestic violence and societal discrimination against women continued, as did violence against children and child labor.

11

12

13

14

Thus, Mr. Saleh and his family face great dangers when they return to Lebanon. He is a suspected enemy of Hezbollah, and he was a victim of persecution from the SLA.  Without question, he and his family's life will suffer greatly after his deportation.

15

16

17

18

19

20

21

22

By analogy, the departure of extreme vulnerability in prison provides the Court with a similar rationale for reducing Mr. Saleh's sentence based on the inevitable persecution he will face in El Salvador.  In *United States v. Lara*, 905 F.2d 599, 601 (2d Cir. 1990) the defendant was convicted of conspiracy and intent to distribute seven kilograms of 97% pure cocaine.  The district court departed down from a sentencing range of 121 to 151 months to 60 months because of the defendant's extreme vulnerability in prison, and the Second Circuit affirmed.  *Id.* at 601-02.

23

24

25

26

27

28

The defendant in *Lara* was described by his attorney as "`a delicate looking young man... [with] a certain sweetness about him,' who had been victimized as a consequence of his diminutive size, immature appearance and bisexual orientation." *Id.* at 601.  The defendant was a boyish-looking twenty two years old. *Id.*  An incident was described in which "two tough males... inmates were attempting to coerce defendant by threats into becoming a male prostitute... for their economic gain

7

1  and... enjoyment." *Id.* at 601.  The defendant was placed in solitary confinement --

2  "the hole,"  for his own safety. *Id.* at 601.

3      The hardship Mr. Saleh will ultimately face in Lebanon – he already has

4  suffered from torture and persecution and had to flee to the United States before

5  seeking political asylum here – should be considered by the Court as an additional

6  mitigating factor warranting a reduced sentence.

7

8

9  **C.     THE COST TO THE UNITED STATES GOVERNMENT OF**

10      **INCARCERATING MR. SALEH, RATHER THAN PLACING HIM**

11      **DIRECTLY IN IMMIGRATION CUSTODY, WEIGHTS IN FAVOR OF**

12      **THE COURT SENTENCING HIM TO TIME SERVED AND**

13      **IMMEDIATE SURRENDER INTO IMMIGRATION CUSTODY**

14      Exhibit G, attached hereto, a May 6, 2008 Memorandum from the

15  Administrative Office of the United States Courts, reveals that in 2007 it would have

16  cost $24,922.00 per year to incarcerate Mr. Saleh.  Based on his immigrant status, he

17  will not be eligible for a community corrections center the final six months of his

18  custodial sentence, and after he is released from custody, he will remain in

19  immigration custody for an extended period of time.  Therefore, if the Court should

20  follow the recommendation of the Probation Office and sentence Mr. Saleh to 30

21  months in custody, the 2007 cost to incarcerate Mr. Saleh will be more than

22  $62,205.00.

23      Mr. Saleh's proposal to surrender himself to immigration custody not only is

24  the right result based on the hardship he will encounter in Lebanon, it is the most

25  fiscally responsible result.  Once Mr. Saleh turns himself in to immigration custody,

26  there is no threat of any future criminal conduct and the United States will be saved

27  substantial funds necessary for other inmates and other programs.

28  \\

8

C.       **A DOWNWARD DEPARTURE IS WARRANTED IN MR. SALEH'S CASE BASED ON EXTRAORDINARY FAMILY RESPONSIBILITY.**

Section 5H1.6 of the Guidelines states that family ties and responsibilities are not ordinarily relevant for determining whether a sentence should be outside the guideline range.  However, "factors not ordinarily relevant... may be relevant to this determination in exceptional cases."  U.S.S.G. §5H, Intro. Commentary. *See United States v. Thomas*, 930 F.2d 526, 530 (7th Cir. 1991)("had the Commission wanted to do that [ban departures based on family ties], it knew how. . ." showing how the commission made race, sex, national origin, creed, religion and socioeconomic factors not relevant for departure purposes in U.S.S.G., § 5H1.10).

Now, based on the Supreme Court's decision in *Booker*, the guidelines are only advisory and family circumstances need to be considered based on the history and characteristics of the defendant under 18 U.S.C. § 3553(a).  Nevertheless, the Commentary to § 5H1.6 gives the Court guidance on how to determine whether the family responsibility of the defendant truly is extraordinary:

(I)       The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to defendant's family.

(ii)      the loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii)     The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

U.S.S.G. commentary to §5H1.6(1)(B).

Mr. Saleh fulfills the criteria set out in the commentary for § 5H1.6. As

1    described in the letter of his wife, attached at Exhibit B:

2
3    I am alone, all my family are in Lebanon and he always stands by
     me and helps me in everything. I do not speak the English
     Language well and I am unable to drive far distances , and I have
4    my youngest son whose name is Muhamad  who has health
     problems  and needs to be seen by the doctor,  and my husband
5    goes with me and is forced to close his store because there is no
     one to help him or to attend to the store for him, and I cannot go
6    by myself to the doctor because he is very far and I do not drive
     far distances. Also I have my eldest daughter who is called Hawra
7    12 years, she has  a lot of pain in her back since a year and a half.
     She likes to help me and I do not let her because I am so afraid for
8    her and she is being treated by a doctor who specializes in bones
     and joints, and he wants to constantly see her and observe her
9    condition and I cannot go  to this doctor  by myself because he is
     very far and that is why I go with my husband because  he is also
10   afraid for her and you know that all the specialists are located  far
     from the area that we live in . Muhamad's doctor Is in Irvine (
11   illegible Memorial Hospital ) and Hawra's doctor is in Long
     Beach.
12
     Also I have a daughter whose name is Zeinab  9years, went to
13   Lebanon in the year 2006, when the war broke out my innocent
     daughter was hit in her head ,chest and hand and these shrapnel's
14   are still in her body and she is being treated up till now from this
     ordeal. And these pains that she has since 2006 , my husband and
15   I take her to a specialist and he tells us that her condition is serious
     and wants to see her constantly and to observe her , and every now
16   and then it comes back to her head and chest and hand and we are
     very worried about her.

17       The problematic health condition of Mr. Saleh's three children, and his integral

18   role in supporting his family, also highlights the extraordinary vulnerability which

19   warrants mitigation in this case:

20       The letter of Paul E. Wakim, M.D., attached at Exhibit H, reveals the condition

21   of Mr. Saleh's 9 year old daughter, Zeina:

22
     **DISCUSSION AND CAUSATION**
23   Ms. Zaina Saleh, a 9-year-old child, was the recipient of shrapnel
     wounds into her skull as well as into her lung on and about July
24   27, 2006, during the war in Lebanon.  Subsequent to the above,
     patient hid under the stairs as the bombs were falling on her house
25   and in the neighborhood.  The patient started bleeding afterwards
     and remained confined to the house for 48 hours due to the
26   ongoing bombing.  They escaped to the mountains of Lebanon
     where she sought help by physicians in that area who diagnosed
27   her with shrapnel wounds to her chest and head

28   Pursuant to the above, the patient has been suffering from ongoing
     headaches mostly on the right side of her head.  Her family doctor

                                    10

recommended that she continue to undergo care and treatment by a specialist

Due to the above injuries sustained, the patient has had ongoing headaches and difficulty associated with the same which appears to be unrelenting to the patient. She appeared to be withdrawn and scared during the examination.

It is the opinion of this qualified medical examiner that this patient should undergo periodic examinations and evaluations pertaining to her head shrapnel injury as well as her lung shrapnel injury. This should be no less than every six months or more should the need arise.

The medical records attached at Exhibit I, reveal the conditions of Mouhamad, the youngest child: possible hydrocephalus (water on the brain); cutis aplasia in the midline lubosacral region (absence of skin); and a low imperforate anus and perineal fistula (malformed rectum often requiring a protective colostomy).

Finally, the medical record attached hereto at Exhibit J confirms the condition of Hawra Saleh, Mr. Saleh's 12 year old daughter:

> PEDIATRIC ORTHOPEDIC SPECIALIST CENTER NOTE
>
> The patient is present with her Mom and Dad and other siblings. She has seen me for back pain for about a year and a half. It is below the scapulas on both sides and she has had it for about a year and a half.
>
> She is 12 years old, born January 25, 1997. She was born full term. Development has been up to date. She is currently in 6th grade. She has pain in her back and under the shoulders for a year and a half.
>
> OBJECTIVE: I had her forward bend. We did take four views of her back.
>
> PLAN: I am still worried about spondylolysis [defect in the vertebrae] and because of that, we are sending her throughout the hospital for a spec scan to rule out spondylolysis and will see her back after the spec scan.
>
> By: FARHAD JOHN HAJALILOO, M.D.

The condition of Mr. Saleh's children, and his commitment to them, are corroborated in the letter of Yousef Chahine, attached to Exhibit B and filed with the Court:

> I also know [Mr. Saleh] as a father of four kids, 2 boys and 2 girls.

11

1
2
3
4
5

His oldest daughter, Hawra'a, is eleven I think, and the youngest son is almost three. Hawra'a injured her back while she was lifting the 5 gallon water bottle during the time when her dad was arrested for few months last year. I remember referring her mom to a chiropractor. His other daughter (6) suffered a head injury during the war in Lebanon in July of 2006, and ever since she became extremely attached to her dad. In addition, his youngest son has certain health issues since his birth, and Mr. Saleh has to take him frequently to the Children's Hospital.

6
7

In sum, Mr. Saleh is the typical hard-working family man trying to make ends meet, and raising four kids, of whom, three have specific health conditions that require special attention, particularly, the caring of a close-by dad.

8
9
10
11
12
13
14
15
16
17
18
19

Several appellate cases have affirmed downward departures for extraordinary family circumstances involving care for dependent family members. *See United States v. Johnson*, 964 F.2d 124, 128-30 (2nd Cir. 1992)(The defendant had sole responsibility for raising four children); *United States v. Alba*, 933 F.2d 1117, 1122 (2nd Cir. 1991)(The defendant was in a 12-year marriage with two children, living with a disabled, dependent father and grandmother); *United States v. Pena*, 930 F.2nd 1486, 1494-95(10th Cir. 1991)(The defendant was the single parent of an infant, and the sole supporter of a 16-year-old daughter and the daughter's infant); *United States v. Rivera*, 994 F.2d 942 (1st Cir. 1993)(mother of three children); *United States v. Sclamo*, 997 F.2d 970 (1st Cir. 1993)(dependence on stepfather of stepson who was abused by father).

20
21
22

The Court in *Johnson* described how extraordinary family responsibilities was a departure based on the condition of the dependents of the defendant, not based on the defendant herself:

23
24
25
26
27

The rationale for a downward departure here is not that Johnson's family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing. Judge Patterson [the district court judge] made it clear that the departure was not on behalf of the defendant herself, but on behalf of her family: "In view of the special circumstances of the defendant - I shouldn't say defendant, I should say of the 'defendant's family,' which, as the court sees it, is a family in which the mother is the sole link between the children . . .

28

> "I [ ] feel that those children being without a mother for an extended period of time was a hardship on them, not on her, hardship on them, and that was extraordinary grounds for a departure."

*Johnson* at 128-30.

Similarly, the defense is not requesting a departure based on the potential suffering of Mr. Saleh; it is based on the needs of his children and his wife that are at issue. As demonstrated by the letter of Mr. Saleh's wife, culturally, she is unable to provide for her family here in Los Angeles. She does not speak English (or Spanish for that matter), she cannot drive any distance, she has no family in the United States, and she does not earn a living - nor can she with her child care responsibilities. It is Mr. Saleh who exclusively provides financial assistance for his sick children. If Mr. Saleh is incarcerated, his absence from the role as the sole provider for these children will have a devastating physical and emotional impact on them.

If Mr. Saleh receives a sentence of time served with a condition of mandatory surrender to immigration custody, he will be deported from this country and his family will follow. As a result all his family will clearly encounter significant hardships in Lebanon, but at least Mr. Saleh will be able to take care of his very fragile family

The alternative – a lengthy period of incarceration prior to deportation – will result in the certain disruption of the family and their inability to function. Consequently, the extraordinary nature of the family circumstances in this case merits a time served sentence.

## III.

## CONCLUSION

Based on the arguments presented herein, the defense respectfully requests a sentence of time served in this case, with a requirement that Mr. Saleh surrender to

1  the custody of the Bureau of Immigration Customs Enforcement.  The expulsion of
2  Mr. Saleh from this country, his return to a war-torn country where he will likely be
3  targeted by some militant group, and the fact that his children, three of whom suffer
4  from medical problems, will be forced to live in a country with significantly lesser
5  medical care, is adequate punishment for this offense.

6          The letters filed separately with the Court at Exhibit B, demonstrate that Mr.
7  Saleh is a committed family man, a good neighbor, and well thought of in his
8  community.  Clearly, he made some substantial mistakes in selling counterfeit goods
9  in order to support his family, and he has pled guilty to this offense.  But his life is
10 more than his criminal conduct and he deserves leniency.

11         The defense is fully aware that the Court sentences individuals for similar
12 violations, and that consistency in sentencing is a critical concern for the Court.  The
13 Court does have the power, however, now after the *Booker* decision, to dramatically
14 distinguish a particular defendant from other similarly situated defendants.  Mr.
15 Saleh's history of persecution in Lebanon, his inevitable deportation to that country,
16 his integral role in the support of his family, and the chronic health problems of his
17 children reveal why he should be distinguished from other similarly situated
18 defendants.

19 \\
20 \\
21 \\
22 \\
23 \\
24 \\
25 \\
26 \\
27 \\
28 \\

14

1   To sentence Mr. Saleh to an excessive time in prison will not serve society in
2   any way, and will only create a greater obstacle for this family – they will be the
3   primary individuals who will suffer.  A sentence of time served with immediate
4   surrender to immigration custody is a fair result in this case

5

6                                          In the interest of justice,

7
                                           Respectfully submitted,
8

9                                          KAYE, McLANE & BEDNARSKI, LLP

10

11

12   DATED: March12, 2009              By_____/S/_____
                                           RONALD O. KAYE
13                                         Attorneys for Defendant
14                                         Hussein Saleh Saleh

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                     15